## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| TODD M. KEENE,<br><br>          Plaintiff,<br><br>v.<br><br>PICKARD SALES COMPANY, INC. d/b/a Midstate RV Center,<br><br>          Defendant. | Civil Action No.:<br><br>5:22-cv-00302<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Todd M. Keene, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq.* Plaintiff alleges that Defendant subjected Plaintiff to discrimination based on his sex and disability, including by subjecting Plaintiff to harassment and a hostile work environment, resulting in the termination of Plaintiff's employment with Defendant, respectfully showing the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1343 and the enforcement provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, and the Americans with Disabilities Act, 42 U.S.C. § 12117.

2.

Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2) because Plaintiff was employed and the events underlying this action occurred in Peach County, Georgia, which is located in this judicial district.

**PARTIES**

3.

Plaintiff Todd M. Keene (hereinafter, "Plaintiff" or "Keene") is a citizen of the United States and a resident of Georgia. At all times relevant to this suit, Mr. Keene was employed with Defendant Pickard Sales Company, Inc. d/b/a Midstate RV Center, located at 131 Peachtree Parkway, Byron, Peach County, Georgia 31008.

4.

At all relevant times, Mr. Keene was considered a covered employee under Title VII of the Civil Rights Act and the Americans with Disabilities Act.

5.

Defendant Pickard Sales Company, Inc. d/b/a Midstate RV Center (hereinafter, "Defendant") is a domestic profit corporation, incorporated under the laws of the State of Georgia. Defendant's principal office is located at P.O. Box 1330, Byron, Georgia 31008. Defendant may be served with process through its registered agent, Ernest L. Pickard, Jr., located at 430 Pickard Road, Byron, Peach County, Georgia 31008.

6.

Defendant operates a dealership selling recreational vehicles and related products to the general public. Said Defendant is engaged in interstate commerce, has annual revenue in excess

of $500,000.00, and has employed in excess of 15 employees, working for at least 20 calendar weeks in 2020 and in prior calendar years.

7.

Defendant is a covered employer with the meaning of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

## STATEMENT OF FACTS

8.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 8, as if the same were set forth herein.

9.

Mr. Keene has been diagnosed with human immunodeficiency virus ("HIV"), the virus that results in a progressive failure of the immune system, a condition known as acquired immunodeficiency syndrome ("AIDS"). This condition is considered a physical impairment, notwithstanding whether a person who is infected is symptomatic. This viral condition affects Mr. Keene's respiratory system, among other bodily functions, and the infection itself is considered highly transmissible. While there are now mediations to treat HIV, including those that reduce the viral load to undetectable levels thereby reducing the risk of transmission of the virus to others, there is currently no known cure for Mr. Keen's medical condition.

10.

Without treatment, HIV substantially limits major life activities, including the operation of major bodily functions like the immune and reproductive systems, the ability to care for oneself, performing manual tasks, interactions and relationships with others, and working.

11.

Even though modern medications are now able to alleviate the symptoms associated with HIV infection, such medications still cause side effects that substantially limit major life activities. For example, the nausea and fatigue associated with these medications results in a person like Mr. Keene experiencing limitations in the ability to eat, sleep, read, concentrate, and work.

12.

Mr. Keene identifies as a gay male.

13.

Mr. Keene previously served as one of Defendant's Sales Professionals, a position in which Mr. Keene excelled and was one of Defendant's highest performing employees.

14.

In November 2019, as a result of Mr. Keene's prior performance, Defendant promoted him to the position of Internet Manager.

15.

Mr. Keene's performance in his new role was also exemplary, and Defendant specifically recognized Mr. Keene for having substantially improved the conversion of leads into paying customers.

16.

Notwithstanding his termination, Mr. Keene was never subjected to any other disciplinary action during his tenure with Defendant.

17.

Around the same time as Mr. Keene's promotion, Defendant promoted Rex Gambill into the position of General Manager (hereinafter, "GM Gambill").

18.

GM Gambill was not Mr. Keene's director supervisor, but as a member of Defendant's upper management, he was in Mr. Keene's chain of command.

19.

At all relevant times, GM Gambill, like many of Mr. Keene's other coworkers, was aware that Mr. Keene identifies as a gay male.

20.

Mr. Keene's sexual orientation did not initially appear to be a problem for GM Gambill. In fact, GM Gambill often took a special interest in Mr. Keene, taking specific efforts to mentor Mr. Keene and often praising his excellent performance.

21.

Prior to his promotion, GM Gambill would sometimes take Mr. Keene out for lunch. However, after his promotion, GM Gambill stopped this practice, telling Mr. Keene that he wanted to avoid the appearance of favoritism toward Mr. Keene compared to other subordinate employees.

22.

However, GM Gambill did treat Mr. Keene differently than other employees in several other respects.

23.

Frequently, and at least several times per week, GM Gambill would make comments to Mr. Keene that were objectively inappropriate in the workplace and that Mr. Keene felt were offensive.

24.

For example, if an attractive male customer entered into the showroom, GM Gambill would make unprovoked comments directly to Mr. Keene, suggesting that Mr. Keene was attracted to the customer and wanted to have sexual intercourse with them.

25.

There were also many occasions in which GM Gambill would ask whether Mr. Keene was attracted to GM Gambill, and others in which GM Gambill suggested that Mr. Keene was.

26.

GM Gambill would also make comments toward Mr. Keene of an express sexual nature, telling Mr. Keene, "you know you want this," "you wish you had all of this," "I'd have fun with you," and even "I would pound you."

27.

In addition to these comments, GM Gambill would frequently make inappropriate physical contact with Mr. Keene while both men were alone in GM Gambill's office.  Most notably, there were several times in which GM Gambill would either brush his hand across Mr. Keene's buttocks or use his hand to slap Mr. Keene in the same area.

28.

There were also many occasions when GM Gambill would use other items in the office, such as folders, to tap or hit Mr. Keene on the backside.

29.

There were several occasions in which several other employees observed GM Gambill make physical contact with Mr. Keene's person, but the other employees would simply laugh as though it had all been a joke.

30.

Mr. Keene did not find such conduct to be a joke or a laughing matter, and in fact, Mr. Keene found GM Gambill's aforementioned comments and physical contacts both extremely uncomfortable and embarrassing.

31.

Based on Mr. Keene's reaction to Mr. Gambill's comments and physical contact, GM Gambill knew or should have known that such conduct was unwelcomed.

32.

Mr. Keene did not initially report GM Gambill's aforementioned conduct and comments because Mr. Keene was in fear of losing his job.

33.

There were several occasions in which Mr. Keene did express his discomfort with or opposition to GM Gambill's conduct and comments, but GM Gambill would respond with comments such as "you know you like it."

34.

GM Gambill refused to cease his conduct.

35.

GM Gambill did not make similar inappropriate comments or physical contact of a sexual nature with any of Defendant's female employees.

36.

GM Gambill did not make similar inappropriate comments or physical contact of a sexual nature with any of Defendant's other male employees who were believed to identify as straight or heterosexual.

37.

GM Gambill only engaged in such conduct toward Mr. Keene because Mr. Keene identifies as a gay male.

38.

GM Gambill's conduct toward Mr. Keene continued on a nearly daily basis from, at least, GM Gambill's late-2019 promotion until July 2020.

39.

Before July 2020, Mr. Keene had not disclosed his HIV diagnosis to anyone employed with Defendant.

40.

In July 2020, Mr. Keene asked to meet with GM Gambill concerning a private issue.  Part of Mr. Keene's compensation was based on a commission, which necessarily fluctuates throughout the year based on sales.  Mr. Keene wanted to speak with GM Gambill because he was concerned that an unusual spike in his monthly pay could cause Mr. Keene to lose his eligibility in a program that helped pay for Mr. Keene's prescription medication concerning the medical condition alleged herein.

41.

When Mr. Keene explained all of this to his boss, GM Gambill continued to press Mr. Keene for additional information, even though Mr. Keene considered the information sensitive and private.

42.

In response to GM Gambill's interrogation, Mr. Keene explained the purpose of the prescription medication, disclosing for the first time during his employment with Defendant that Mr. Keene had been diagnosed with HIV.

43.

When GM Gambill learned that Mr. Keene was HIV positive, GM Gambill told Mr. Keene simply, "you and I won't ever have a sexual relationship."

44.

Before Mr. Keene left the conversation, GM Gambill advised Mr. Keene not to tell anyone else about his viral condition "because it won't be a happy environment for you."

45.

Critically, it was only at this very moment in July 2020, when he learned that Mr. Keene was HIV positive, that GM Gambill stopped making physical contact and sexually-charged comments toward Mr. Keene. Indeed, from this point on, there was a clear, noticeable change in how GM Gambill treated and interacted with Mr. Keene.

46.

Around the same time as Mr. Keene's July 2020 conversation with GM Gambill, Defendant hired LeAnna Phillips as its Internet Director (hereinafter, "Director Phillips").   In this role, Director Phillips would be Mr. Keene's direct supervisor.

47.

During the first week of Director Phillips' employment, she began asking Mr. Keene about his private life and personal information.

48.

For example, in one of their first interactions, Director Phillips asked Mr. Keene if he had a wife or girlfriend.  Mr. Keene answered the question by telling Director Phillips that he is gay. Director Phillips responded by saying that she could tell Mr. Keene was gay, but she continued by discussing her own sexual orientation as well as about some of her prior sexual relationships. Director Phillips also told Mr. Keene about her ex-husband's sexual orientation, and she explained, in extreme and shocking detail, what the former couple had done and liked to do together with specific adult toys.

49.

Mr. Keene found his conversation with Director Phillips to be inappropriate and extremely odd, but he tried to ignore the comments and return to work.

50.

However, Director Phillips continued to make similar comments of a sexual nature to Mr. Keene on a routine and daily basis.

51.

On one occasion, Director Phillips told Mr. Keene, "believe me, I could have any dick in this dealership, but I am engaged and I am not doing that."

52.

When Director Phillips made comments like this to Mr. Keene, it made him feel as though Director Phillips wanted, and was trying, to have sexual intercourse with Mr. Keene.

53.

Regardless of Director Phillips' intent, Mr. Keene found her comments to be inappropriate, unwelcomed, and offensive.

54.

Shortly after Director Phillips began her employment and made the aforementioned comments to Mr. Keene, GM Gambill returned to work from a short vacation.  Mr. Keene approached GM Gambill, who could apparently tell that something was bothering Mr. Keene and asked what was wrong.  Mr. Keene told GM Gambill that he felt weird, and Mr. Keene described the things that Director Phillips had been saying to him to cause him to feel that way.  GM Gambill did not take Mr. Keene's complaint seriously, telling Mr. Keene that he had certainly heard worse, and that Mr. Keene should try to give Director Phillips a chance.

55.

On August 11, 2020, Mr. Keene needed to pick up a rental car, and when Director Phillips learned this information, she offered to drive Mr. Keene to pick up the vehicle up during their lunch break.  During the trip, Director Phillips began explicitly questioning Mr. Keene about his sexual orientation.

56.

As the ride continued, Director Phillips told Mr. Keene that she did not believe that Mr. Keene was gay.

57.

Director Phillips also asked Mr. Keene whether he was sexually attracted to her.  When Mr. Keene explained that he was not, Director Phillips kept insisting that Mr. Keene was not telling her the truth about his sexual orientation and the fact that he was not attracted to Director Phillips.

58.

When they arrived at the car rental location, Director Phillips told Mr. Keene, "I think we're going to have a problem," to which Mr. Keene tried to ensure Director Phillips was not true.

59.

Director Phillips did not make similar comments of a sexual nature with any of Defendant's female employees.

60.

Director Phillips did not insist that any of Defendant's female employees, regardless of sexual orientation, were attracted to Director Phillips.

61.

Director Phillips did not make similar comments of a sexual nature with any of Defendant's other male employees who were believed to identify as straight or heterosexual.

62.

Director Phillips did not insist that any of Defendant's male employees, who were believed to identify as straight or heterosexual, were attracted to Director Phillips

63.

Director Phillips only engaged in such conduct toward Mr. Keene because Mr. Keene is male and identifies as gay.

64.

When Mr. Keene returned to work, he checked his recent direct deposit.  Mr. Keene believed that his recent commission payment appeared to be lower than expected, which Mr. Keene explained to Director Phillips when she asked him what was wrong.  Director Phillips explained that she and Defendant's Sales Manager had gone over Mr. Keene's commissions, and they decided that Mr. Keene had not had "a good attitude" during the week of one of his sales, and as a result, they decided he would not get the commission.

65.

For the remainder of the day, Director Phillips continued to question Mr. Keene about his attitude.

66.

Several days earlier, Mr. Keene had received a call from Defendant's Sales Manager, asking Mr. Keene to come to his office.  When Mr. Keene arrived, the Sales Manager explained that one of Defendant's sales professional had two customers that were making the sales professional "feel very uncomfortable."  Apparently, the sales professional had felt like these two customers, who were both male and married to one another, were making sexual advances toward the male sales professional.

67.

Since Mr. Keene had been promoted to Internet Manager in November 2019, he no longer had duties associated with a sales professional, including to make sales to customers.

68.

However, the Sales Manager asked Mr. Keene to take over for the sales professional with regard to the aforementioned customers solely because of Mr. Keene's sexual orientation.

69.

While Mr. Keene was not happy about being assigned to a task solely on account of his sexual orientation, he gladly complied with the Sales Manager's request, and Mr. Keene left to approach and greet the customers.

70.

The initial sales representative had told Mr. Keene that the customers had been referred to Defendant by the owner of an LGBTQ+ friendly campground for which Mr. Keene was familiar,

and after Mr. Keene introduced himself to the customers, the three men briefly discussed the campground.

71.

The Sales Manager was eavesdropping on Mr. Keene's conversation with the customers. As a result, the Sales Manager likely overheard the customers making low-ball offers to purchase one of Defendant's recreational vehicles ("RV") for sale. When Mr. Keene was later able to close the deal and sell the RV on more-favorable terms for Defendant, the Sales Manager gave Mr. Keene a high-five and told him that he had done a "good job."

72.

After the customers' newly purchased RV had been delivered to them, Mr. Keene happened to see them at the aforementioned LGBTQ+ campground. The three men talked and laughed over a few drinks and became more acquainted. However, during this conversation, the customers made no mention of problems with the sale or delivery of their new RV.

73.

On August 12, 2020, the day following Mr. Keene's rental car excursion with Director Phillips, Mr. Keene had the day off. In addition to the short period of time that Mr. Keene spent out of work on August 11, 2020, he had also been on vacation the prior week.

74.

When Mr. Keene returned to work on August 13, 2020, he received a telephone call from one of the two customers described above. The customer, who was very irate, explained that he had sent Mr. Keene several emails about an issue with his new RV. This was a surprise to Mr. Keene because he had not seen the emails at issue during his recent time out of the office.

75.

Previously, Defendant had advised its employees in the sales and internet departments concerning how to handle calls from customers with questions, concerns, or complaints. Defendant instructed employees to quickly route such calls to the service department so the sales and internet employees could continue their focus on converting leads and making sales.

76.

As the customer spoke angrily to Mr. Keene about the problems with his RV, Mr. Keene tried to transfer the customer to the service department several times, but the customer insisted on continuing his diatribe. Mr. Keene was somewhat frustrated about this, not only because of the customer's tone and Mr. Keene's inability to hand him off to the appropriate point of contact, but because the only reason that Defendant had Mr. Keene interact with the customer in the first place was solely because the initial sales professional was uncomfortable with assisting a gay couple and because Mr. Keene is, himself, gay.

77.

At one point in the conversation, the frustrated Mr. Keene told the customer, whom he had become familiar with outside of work, "you're really being an ass."

78.

Without suggesting that Mr. Keene's response to the customer was appropriate, he had heard far worse in the workplace.  Critically, the comments that Mr. Keene's supervisors made toward him, as alleged herein, were far worse than what Mr. Keene said.  It was also not uncommon to hear profanity in the workplace, including Defendant's employees and managers who used profanity with both customers and staff.  For example, one employee, who happens to be the wife of the owner of the company, would often use profanity to describe customers who had complaints,

and she once told two prospective customers, "if you don't like it, get the fuck off our property." She even used such abusive and profane language toward one female employee to the extent that it made her cry and resulted in her resignation, even though she had recently received a promotion. The employees using vulgar language were not subjected to disciplinary action as a result.

79.

Director Phillips overheard Mr. Keene's conversation with the customer at issue. When Mr. Keene hung up, he tried to explain that the person he was speaking to was an acquaintance. Director Phillips appeared concerned about Mr. Keene's demeanor after the call and she asked Mr. Keene if he would like to go home for the rest of the day, not appearing to be a disciplinary action; rather, as though she were concerned about Mr. Keene's well-being.

80.

At that time, Director Phillips did not tell Mr. Keene that he had done anything wrong or that he would be subjected to any discipline.

81.

Around two hours after Mr. Keene returned home, he received a call from Director Phillips, who explained that Mr. Keene was being terminated effective immediately.

82.

Upon information and belief, Director Phillips and GM Gambill used Mr. Keene's conversation with the customer as pretext for terminating his employment , as opposed to Mr. Keene's opposition to their sexual advances.

83.

Approximately one week after Mr. Keene was terminated, he contacted GM Gambill by phone. Once again, Mr. Keene told GM Gambill about the inappropriate comments made by

Director Phillips, and Mr. Keene also explained that he was offended by GM Gambill's response to Mr. Keene's disclosure of his medical condition.  Mr. Keene also raised the issue of the commission that he did not receive.

84.

After Mr. Keene was done talking, GM Gambill abruptly asked what Mr. Keene wanted, but GM Gambill added, "well, you know you're gay, so you don't have many options."  Mr. Keene calmly responded that he just wanted his commission and an apology for the treatment he experienced, to which GM Gambill said, "not going to happen" before abruptly hanging up the phone.

Procedural/Administrative Background

85.

On or about November 17, 2020, Mr. Keene submitted his Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that he had been subjected to discrimination based on sex and disability in violation of Title VII of the Civil Rights Act and the Americans with Disabilities Act, respectively, as well as retaliation after he opposed and reported treatment that he perceived to be actionable sexual harassment.  The EEOC assigned Mr. Keene Charge Number 410-2021-01968.

86.

Defendant had notice of Mr. Keene's Charge of Discrimination, participated in the administrative proceedings before the EEOC, and was represented by counsel during said proceedings.

87.

The EEOC ultimately issued its Dismissal and Notice of Rights dated May 20, 2022, which

Mr. Keene, through counsel, received on May 23, 2022.

88.

Mr. Keene has exhausted his administrative remedies as to her Charge of Discrimination,

and he is filing the instant action within ninety days of both the issuance and his receipt of the

EEOC Notice of Right to Sue.

**COUNT I:**
**DISCRIMINATION BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

89.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in

Paragraphs 1 through 88, as if the same were set forth herein.

90.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate against

any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

91.

Title VII's prohibition on discrimination based on sex includes an employer who

discriminates against an individual because of such person's sexual orientation. *Bostock v. Clayton

Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020).

92.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and

employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

93.

Plaintiff is a member of a protected class in that he is male and identifies as gay or homosexual.

94.

Plaintiff was qualified for his position as Internet Manager and his performance in this role was exemplary at all relevant times.

95.

In or around July or August 2020, Defendant gave Plaintiff the specific assignment of attempting to close a sale with two customers, even though this was not one of Plaintiff's job duties at the time, and only because Plaintiff identifies as gay.

96.

As a result, Defendant made a decision concerning the terms and conditions of Plaintiff's employment solely on the basis of Plaintiff's sexual orientation, and as a necessary result, his sex.

97.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for changing the terms and conditions of Plaintiff's employment solely on the basis of his sex.

98.

Plaintiff has been injured by Defendant's discrimination against him based on his sex, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT II:**
**HOSTILE WORK ENVIRONMENT BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

99.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 88, as if the same were set forth herein.

100.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate or harass against any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

101.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because of such person's sexual orientation.  *Bostock v. Clayton Cnty.*, 590 U.S. _____, 140 S. Ct. 1731 (2020).

102.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

103.

Plaintiff is a member of a protected class in that he is male and identifies as gay or homosexual.

104.

As alleged herein, from the period of, at least, November 2019 through July 2020, Defendant's General Manager subjected Plaintiff to sexually-charged comments, physical contacts, and sexual advances solely because Plaintiff is male and identifies as gay or homosexual.

105.

As alleged herein, such conduct included Defendant's General Manager making inappropriate comments concerning Defendant's male customers and suggesting that Plaintiff wanted to engage in sexual intercourse with them, Defendant's General Manager making explicit comments about engaging in sexual intercourse with Plaintiff, and Defendant's General Manager using items around the office or his own hands to make physical contact of a sexual nature with Plaintiff's person.

106.

The conduct for which Plaintiff was subjected by Defendant's General Manager was severe enough to alter and change the Plaintiff's working conditions and the terms and conditions of his employment.

107.

Plaintiff was subjected to the aforementioned conduct on a regular and near-daily basis from, at least, November 2019 through July 2020.  As a result, the harassment that Plaintiff experienced was pervasive enough to alter and change the Plaintiff's working conditions and the terms and conditions of his employment.

108.

Defendant's General Manager's conduct was unwelcomed by Plaintiff, which Plaintiff communicated to Defendant's General Manager.

109.

Despite Plaintiff's efforts to resist Defendant's General Manager's conduct and sexual advances, the General Manager refused to cease his behavior.

110.

Any reasonable person would have found Defendant's General Manager's conduct toward Plaintiff to be both hostile and abusive.

111.

Any reasonable person who identifies as gay or homosexual would have found the aforementioned conduct particularly hostile and abusive.

112.

Plaintiff's supervisors were not only aware of the harassment, Plaintiff's supervisor was directly responsible for such harassment, but Plaintiff's supervisors failed to address or correct the conduct, or provide Plaintiff with any opportunity to engage in any preventative or corrective measures.

113.

Accordingly, Defendant subjected Plaintiff to harassment and hostile work environment in violation of Title VII of the Civil Rights Act.

114.

Accordingly, Defendant is liable for the conduct of its supervisory employee.

115.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the offensive conduct for which Plaintiff was subjected, as alleged herein.

116.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less

than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT III:
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

### 117.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 88, as if the same were set forth herein.

### 118.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to retaliate against an employee because he has opposed any unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a).

### 119.

As alleged in Count II, *supra*, Plaintiff was subjected to harassment and a hostile work environment by Defendant's General Manager based on Plaintiff's sex.

### 120.

As alleged herein, Plaintiff attempted to resist the sexual advances of Defendant's General Manager, Plaintiff advised his harasser that such conduct was unwelcomed, and Plaintiff explicitly opposed such conduct.

### 121.

Within approximately one month of Plaintiff's last efforts to resist Defendant's General Manager's sexual advances and oppose such conduct, Plaintiff was terminated by Defendant's General Manager on August 13, 2020.

122.

Defendant is unable to articulate any legitimate, nondiscriminatory reason terminating Plaintiff's employment.

123.

Defendant's stated reasons for terminating Plaintiff's employment – that he used profanity in a conversation with a customer – was not the actual basis for Defendant's termination of Plaintiff, and Plaintiff will prove that such reason was pretextual and reflects Defendant's attempt to hide the actual reason for its retaliatory termination of Plaintiff.

124.

Plaintiff has been injured by Defendant's retaliatory conduct in response to Plaintiff's opposition to harassment and hostile work environment by Defendant's General based on sex, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT IV:**
**HOSTILE WORK ENVIRONMENT BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

125.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 88, as if the same were set forth herein.

126.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate or harass against any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

127.

Title VII's prohibition on discrimination based on sex includes an employer who discriminates against an individual because of such person's sexual orientation. *Bostock v. Clayton Cnty.*, 590 U.S. ____, 140 S. Ct. 1731 (2020).

128.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively.  *See* 42 U.S.C. §§ 2000e & 2000e-1.

129.

Plaintiff is a member of a protected class in that he is male and identifies as gay or homosexual.

130.

As alleged herein, from the period of, at least, July 2020 through August 2020, Defendant's Internet Director subjected Plaintiff to sexually-charged comments solely because Plaintiff is identifies as gay or homosexual.

131.

As alleged herein, such conduct included Defendant's Internet Manager making inappropriate comments concerning her own sexual orientation and the individuals in which she had previously had sexual intercourse, sharing detailed and explicit information concerning her sexual activities and use of adult toys with her former husband, suggesting that she could have sexual intercourse with Defendant's male employees and specifically suggesting that she wanted to have sexual intercourse with Plaintiff, and questioning Plaintiff's sexual orientation and insisting that he was not actually gay.

132.

The conduct for which Plaintiff was subjected by Defendant's General Manager was severe enough to alter and change the Plaintiff's working conditions and the terms and conditions of his employment.

133.

Plaintiff was subjected to the aforementioned conduct on a regular and near-daily basis from, at least, July 2020 through August 2020.  As a result, the harassment that Plaintiff experienced was pervasive enough to alter and change the Plaintiff's working conditions and the terms and conditions of his employment.

134.

Defendant's Internet Director's conduct was unwelcomed by Plaintiff, which Plaintiff communicated to Defendant's Internet Director.

135.

Any reasonable person would have found Defendant's Internet Director's conduct toward Plaintiff to be both hostile and abusive.

136.

Any reasonable person who identifies as gay or homosexual would have found the aforementioned conduct particularly hostile and abusive.

137.

Plaintiff's supervisors were not only aware of the harassment, Plaintiff's supervisor was directly responsible for such harassment and Plaintiff further reported such conduct to Defendant's General Manager, but Plaintiff's supervisors failed to address or correct the conduct, or provide Plaintiff with any opportunity to engage in any preventative or corrective measures.

138.

Accordingly, Defendant subjected Plaintiff to harassment and hostile work environment in violation of Title VII of the Civil Rights Act.

139.

Accordingly, Defendant is liable for the conduct of its supervisory employee.

140.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the offensive conduct for which Plaintiff was subjected, as alleged herein.

141.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT V:**
**HOSTILE WORK ENVIRONMENT BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

142.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 88, as if the same were set forth herein.

143.

Under Title VII of the Civil Right Act, it is unlawful for an employer to discriminate or harass against any of its employees on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a).

144.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under Title VII, respectively. *See* 42 U.S.C. §§ 2000e & 2000e-1.

145.

Plaintiff is a member of a protected class in that he is male.

146.

As alleged herein, from the period of, at least, July 2020 through August 2020, Defendant's Internet Director made explicit sexual advances toward Plaintiff solely because he is male.

147.

As alleged herein, such conduct included Defendant's Internet Manager routinely making sexual advances toward Plaintiff and specifically stating that she wished to have sexual intercourse with Plaintiff.

148.

The conduct for which Plaintiff was subjected by Defendant's General Manager was severe enough to alter and change the Plaintiff's working conditions and the terms and conditions of his employment.

149.

Plaintiff was subjected to the aforementioned conduct on a regular and near-daily basis from, at least, July 2020 through August 2020.   As a result, the harassment that Plaintiff experienced was pervasive enough to alter and change the Plaintiff's working conditions and the terms and conditions of his employment.

150.

Defendant's Internet Director's conduct was unwelcomed by Plaintiff, which Plaintiff communicated to Defendant's Internet Director.

151.

Any reasonable person would have found Defendant's Internet Director's conduct toward Plaintiff to be both hostile and abusive.

152.

Plaintiff's supervisors were not only aware of the harassment, Plaintiff's supervisor was directly responsible for such harassment and Plaintiff further reported such conduct to Defendant's General Manager, but Plaintiff's supervisors failed to address or correct the conduct, or provide Plaintiff with any opportunity to engage in any preventative or corrective measures.

153.

Accordingly, Defendant subjected Plaintiff to harassment and hostile work environment in violation of Title VII of the Civil Rights Act.

154.

Accordingly, Defendant is liable for the conduct of its supervisory employee.

155.

Defendant is unable to articulate any legitimate, nondiscriminatory reason for the offensive conduct for which Plaintiff was subjected, as alleged herein.

156.

Plaintiff has been injured by Defendant's harassment and hostile work environment, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less

than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT VI:
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

157.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 88, as if the same were set forth herein.

158.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to retaliate against an employee because he has opposed any unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a).

159.

As alleged in Count V, *supra*, Plaintiff was subjected to harassment and a hostile work environment by Defendant's Internet Director based on Plaintiff's sex.

160.

As alleged herein, Plaintiff attempted to resist the sexual advances of Defendant's Internet Director, Plaintiff advised his harasser that such conduct was unwelcomed, and Plaintiff explicitly opposed such conduct.

161.

Within several days of Plaintiff's last efforts to resist Defendant's Internet Director's sexual advances and oppose such conduct, Plaintiff was terminated by Defendant's General Manager and Internet Director on August 13, 2020.

162.

Defendant is unable to articulate any legitimate, nondiscriminatory reason terminating Plaintiff's employment.

163.

Defendant's stated reasons for terminating Plaintiff's employment – that he used profanity in a conversation with a customer – was not the actual basis for Defendant's termination of Plaintiff, and Plaintiff will prove that such reason was pretextual and reflects Defendant's attempt to hide the actual reason for its retaliatory termination of Plaintiff.

164.

Plaintiff has been injured by Defendant's retaliatory conduct in response to Plaintiff's opposition to harassment and hostile work environment by Defendant's Internet Manager based on sex, and Plaintiff is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT VII:
## DISCRIMINATION BASED ON DISABILITY
## IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

165.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 88, as if the same were set forth herein.

166.

The Americans with Disabilities Act prohibits covered entities from "discriminating against a qualified individual on the basis of disability in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensations, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

167.

As alleged herein, Defendant and Plaintiff are a covered, non-exempt employer and employee under the ADA, respectively. *See* 42 U.S.C. § 12111.

168.

As alleged herein, Plaintiff has a disability, a history of a disability, and was perceived by Defendant as having a disability, that substantially limits a number of major life activities. Specifically, Plaintiff has been diagnosed with human immunodeficiency virus ("HIV").

169.

As alleged herein, HIV substantially limits a person's major life activities, including the operation of major bodily functions like the immune and reproductive systems, the ability to care for oneself, performing manual tasks, interactions and relationships with others, and working.

170.

Even when a person like Plaintiff treats HIV with medication, this medical condition and the side effects of such medication also substantially limit major life activities.  For example, the nausea and fatigue associated with such medications results in limitations to the ability to eat, sleep, concentrate, and work.

171.

Defendant, through its General Manager, became aware of Plaintiff's disability in or around July 2020.

172.

As alleged herein, Plaintiff received a promotion to the position of Internet Manager in or around November 2019, and Plaintiff had been performing his duties in that role, and was otherwise qualified and able to perform the essential functions of his job, with or without a reasonable accommodation.

173.

From the moment that Plaintiff disclosed his disability to Defendant's General Manager in or around July 2020, Defendant's General Manager's treatment of Plaintiff changed immediately.

174.

Indeed, one of the changes in the way Plaintiff was treated was that Defendant's General Manager no longer subjected Plaintiff to sexual harassment, he no longer made sexual advances toward Plaintiff, and Defendant's General Manager even stated, "you and I won't ever have a sexual relationship."

175.

Within merely several weeks after Plaintiff disclosed his disability to Defendant's General Manager, Defendant terminated Plaintiff's employment due to said disability.

176.

Defendant is unable to articulate any legitimate, nondiscriminatory reason terminating Plaintiff's employment.

177.

Defendant's stated reasons for terminating Plaintiff's employment – that he used profanity in a conversation with a customer – was not the actual basis for Defendant's termination of

Plaintiff, and Plaintiff will prove that such reason was pretextual and reflects Defendant's attempt to hide the actual reason for its discriminatory termination of Plaintiff.

178.

Instead, comments made by Defendant's General Manager reflect that Defendant's termination of Plaintiff was based on Defendant's discriminatory motives, including that if Plaintiff disclosed his disability to anyone else in the workplace "it won't be a happy environment for you" and the General Manager's telephone call with Plaintiff after he was terminated.

179.

Plaintiff has been injured by Defendant's discrimination against Plaintiff based on his disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including back pay, front pay and injunctive relief, compensatory and punitive damages in an amount of not less than $300,000.00, or such other amount as allowed by statute, and reasonable attorney's fees and costs of litigation, all in an amount to be proven at trial.

180.

Plaintiff has been injured by Defendant's discrimination due her disability, and Plaintiff is entitled to all damages allowed under the Americans with Disabilities Act, including compensatory damages, reinstatement, backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Todd M. Keene respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant Pickard Sales Company, Inc. d/b/a Midstate RV Center, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for discrimination based on sex, particularly Plaintiff's sexual orientation, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for hostile work environment based on sex, particularly Plaintiff's sex and sexual orientation, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for retaliation for expressing opposition to Defendant's discriminatory practices based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

6)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count IV for hostile work environment based on sex, particularly Plaintiff's sex and sexual orientation, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

7)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count V for hostile work environment based on sex, particularly Plaintiff's sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

8)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VI for retaliation for expressing opposition to Defendant's discriminatory practices based on sex, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

9)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VII for discrimination based on disability, and grant Plaintiff all relief allowable under the Americans with Disabilities Act; and,

10)     For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 18th day of August, 2022.

KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com